UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JERMAINE D. BROOKS,<br><br>    Petitioner,<br><br>  v.<br><br>J. WALKER, Warden,<br><br>    Respondent. / | No. C 09-1355 LHK (PR)<br><br>**AMENDED ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

This is a federal habeas corpus action filed pursuant to 28 U.S.C. § 2254 by a *pro se* state prisoner. For the reasons set forth below, the petition is DENIED.

## BACKGROUND

In 2005, an Alameda County Superior Court jury found Petitioner guilty of first degree felony murder, consequent to which he was sentenced to a term of life in prison without the possibility of parole, plus ten years for a sentencing enhancement. Petitioner filed the instant federal habeas action after he was denied relief from the verdict on direct and collateral state review.

Evidence presented at trial shows that in 2001, Petitioner, along with codefendants Anthony Brown (hereafter "Anthony") and Derek Brown (hereafter "Derek"), shot and killed a security guard, James Miller, during the course of an attempted robbery of a "convenience" store. The state appellate court summarized the facts as follows:

> [Alex] was working as a cashier at the 7-Eleven store at 4720 MacArthur Boulevard in Oakland on October 31, 2001. Security guard James Miller and clerk Isayas Debessay were also present in the store about 10:30 p.m. when defendants entered . . .
>
> When Derek and Anthony came up to the register, Derek took beef jerky from the counter and paid with a five-dollar bill. Anthony was next to him. Alex placed the five-dollar bill in the cash register and took out $4.01 in change. After closing the register, Alex turned to his right because he felt there was something going on there. When he turned, Alex saw that [Petitioner] was pointing a white-colored gun at Miller's head. Believing it was a robbery, Alex raised his hands and told Miller to give up his gun. Miller resisted and held [Petitioner's] wrist with one hand. It appeared to Alex that Miller was trying to take the gun from [Petitioner].
>
> When Alex first saw the gun, Debessay was standing next to him. Debessay ran away to the store's office, and Alex backed away and ran behind a shelf. From behind the shelf, he saw Derek and Anthony move toward Miller. He saw one of the defendants trying to grab Miller's gun, but could only see his hand, not his face. The person tried once or twice to pull out the gun but was not successful. The altercation occurred near the front door. Seeing a chance to escape, Alex ran to the bathroom and closed the door. From the bathroom, Alex heard a single gunshot.
>
> Debessay waited a minute or two before coming out of the office, and then called 911. He saw Miller walking slowly out of the store. A tape of the 911 call was played for the jury. Debessay told the operator that somebody just shot "my security guard" and that "[h]e wants to rob us." Alex tells the operator, "We got robbing" by "three black people."

(Ans., Ex. O at 4–5) (footnote omitted). Miller later died.

As grounds for federal habeas relief, Petitioner alleges that (1) the trial court committed *Batson* error; (2) his sentence of life without the possibility of parole constitutes cruel and unusual punishment; (3) the admission of pre-trial statements of witness Chandler that were described as "credible" and "accurate" violated Petitioner's Sixth Amendment

rights; and (4) there was prosecutorial misconduct.[1]

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

---

[1] Petitioner put forth other claims in which he asked to join in the arguments raised in his co-defendants' petitions. These other claims were dismissed on initial screening.

# DISCUSSION

## I. Challenges of Potential Jurors

Petitioner claims that the prosecutor used her peremptory strikes to strike three prospective jurors — identified as Jurors B., S., and F. — on the basis of race, thereby violating his Sixth Amendment jury trial rights. (Pet. at 5.) The relevant facts are as follows. Defense counsel objected to the prosecution's use of peremptory challenges against Jurors B., S., and F, who were the sole remaining African-American prospective jurors. The trial court asked the prosecutor to give her reasons for using her challenges:

> [Juror B]
>
> The prosecutor stated that she had numerous reasons for excusing Juror B. Juror B. was a single mother who had her first child at age 18 and her second at age 21, by different fathers. Although Juror B. had worked for the last 12 years in a relatively conservative environment — the clerk's office of a federal bankruptcy court — the prosecutor believed that Juror B. seemed to have a very nontraditional and "kind of counter cultural" lifestyle, based on her personal appearance and lifestyle choices. Regarding Juror B.'s personal appearance, the prosecutor cited her "red streakish hair." She believed Juror B. was "not someone who would be . . . a conservative juror that would convict somebody." The prosecutor was also concerned that Juror B. seemed "very eager" to get on the jury, because she had said she was "concerned about giving incorrect answers" and seemed not to be "completely candid about . . . her feelings."
>
> The defense argued that some of the prosecutor's stated reasons were contradictory insofar as Juror B. was too eager to serve on the jury but Juror R. was too reluctant. The defense also challenged the portrayal of Juror B. as nontraditional in light of the fact that she worked for a federal court, had moved to a different community so her children could attend better schools, and described her spare time activities in her questionnaire response as staying at home with her daughters, going out with family and friends, and going to movies or church. The defense also noted that Juror B.'s hair color was "quite a common thing today."
>
> The trial court stuck by its original ruling that defendants failed to make out a prima facie case of discrimination but commented that the issue was "much, much closer . . . as to [Juror B.] than it was as to [Juror R.].[2]"
> . . . .

---

[2] The striking of Juror R. was not raised as an issue in the instant action.

[Juror S.]

As to Prospective Juror S., the prosecutor asserted that she had been charged with felony welfare fraud and perjury in 2001, eventually pleading guilty to misdemeanor welfare fraud under a plea agreement. According to the prosecutor, Juror S. had implied that she was put in a diversion program, and was not forthright in disclosing that she had in fact sustained a criminal conviction and might have still been on probation. The prosecutor also stated that Juror S. admitted she would have a hard time applying the felony-murder rule to an aider and abettor, although she also indicated that she would be able to follow the law. The prosecutor pointed to several White male jurors whom she had excused for that same reason.

. . . .

[Juror F.]

As for Prospective Juror F., the prosecutor explained that she was a senior legal document specialist at a law firm and the prosecutor was concerned that the other jurors would tend to defer to lawyers or "quasi-lawyers" in deliberations. The prosecutor pointed out that she had previously excused a court administrator who was not an actual lawyer, but who had a juris doctor degree and whose wife was a lawyer, because it was her practice to excuse all "lawyers, semi-lawyers, [and] quasi-lawyers on the panel." She also expressed concern about Juror F.'s view that, according to statistics she had learned about in her political science classes, the criminal justice system treats minorities unfairly. The prosecutor stated that Juror F. had initially denied holding any negative views of the criminal justice system when she first began to probe her on that subject. As further reasons, the prosecutor expressed concern that Juror F. "perhaps oversees and possibly critiques" the work of attorneys, and might scrutinize the prosecutor's work. According to the prosecutor, when she had jokingly asked Juror F. whether she disliked attorneys, Juror F. had not denied it. Finally, the prosecutor was concerned that Juror F. seemed to be falling asleep for most of that afternoon's proceedings and "perhaps was not interested in the whole process."

The defense contended that Juror S. was candid in her answers about her criminal history and may have simply misunderstood the precise disposition of her prior case. The defense also challenged the prosecutor's assertion that she excused all prospective jurors who, like Juror S., questioned the fairness of felony-murder liability for an aider and abettor, noting that Juror No. 8, who was ultimately seated as a juror, raised similar concerns. As for Prospective Juror F., the defense argued that she said nothing to indicate any antipathy to attorneys. She had her eyes closed at times, as did many of the prospective jurors, but she was not sleeping.

(Ans., Ex. O at 12–15) (footnotes removed).

The state appellate court rejected Petitioner's *Batson* claims. As to Juror B., the appellate panel found that the trial court could reasonably have found that the prosecutor's stated reasons for excusing Juror B. were genuine. (*Id.* at 18.) The prosecutor contended

that Juror B. had a nonconformist or nontraditional lifestyle as evidenced by her red streakish hair and her having had children by two different fathers at a young age and her never having been married. (*Id.*) It also rejected defense counsel's assertion that Juror B.'s family arrangements were similar to those of a person seated as an alternate juror. (*Id.* at 19.) The alternate juror had lost touch with his daughter when she was 17 years old, and had had no contact with her for several years, and thus was not similar to Juror B. (*Id.* at 18–19.)

As to Juror S., the state appellate court found that the record supported the prosecutor's reasons that Juror S. had been criminally prosecuted, and that she had expressed "significant reservations" about applying the legal rules on aider and abettor liability, an issue of great importance to the case at hand. (*Id.* at 19.) The court rejected as unpersuasive Petitioner's assertion that the prosecutor did not challenge other jurors who expressed similar reservations about aider and abettor liability. (*Id.* at 20.) These other jurors, the court stated, had not, unlike Juror S., been criminally prosecuted, and had milder reservations about applying the aider and ability theory of criminal liability. (*Id.*)

As to Juror F., the state appellate court rejected as unpersuasive Petitioner's claim that the prosecutor did not consistently apply her professed policy of striking lawyers and semi-lawyers. According to the prosecutor, Juror F. fell into the category of quasi-lawyers because she currently worked as a senior legal document specialist at a law firm. (Ans., Ex. O at 14, 20–21.) Possibly comparable jurors, such as Juror T., Juror A.T., and Juror 7, lacked such a strong connection to the legal profession, as the state appellate court discussed. Juror T., who had worked for a sheriff's department 20 years earlier for about two years and had both testified and worked as a bailiff for part of that two-year period, was not comparable. (*Id.* at 21.) If anything, Juror T.'s background made him appealing to the prosecution, and in fact, the defense excused him. (*Id.*) Juror A.T. was not comparable because he had left a career in criminal justice eight years earlier and was now employed as an airline pilot. (*Id.*) Juror No. 7 was not comparable because his job as a political consultant for campaigns for judges and district attorneys "does not present nearly the same risk of being attributed with special

expertise by fellow jurors" as Juror F., whose professional career consists of assisting lawyers in handling legal cases. (*Id.* at 21.) Also, Juror F.'s opinion that the criminal justice system treats minorities unfairly "further distinguished" her from other jurors. (*Id.*)

The use of peremptory challenges by either the prosecution or defense to exclude cognizable groups from a petit jury may violate the Equal Protection Clause. *See Georgia v. McCollum*, 505 U.S. 42, 55–56 (1992). In particular, the Equal Protection Clause forbids the challenging of potential jurors solely on account of their race. *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986). *Batson* permits prompt rulings on objections to peremptory challenges pursuant to a three-step process. First, the defendant must make out a prima facie case that the prosecutor has exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 93–94. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id.* at 97; *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000). Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98; *Wade*, 202 F.3d at 1195. A federal habeas court need not dwell on the first step of the *Batson* analysis if the matter has proceeded to the second or third step. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991).

To fulfill its duty, the court must evaluate the prosecutor's proffered reasons and credibility in light of the totality of the relevant facts, using all the available tools including its own observations and the assistance of counsel. *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004). A legitimate reason "is not a reason that makes sense, but a reason that does not deny equal protection." *Purkett v. Elem*, 514 U.S. 765, 769 (1995). What matters is the "genuineness of the motive" behind the racially-neutral explanation, not "the reasonableness

of the asserted nonracial motive." *Id.* In evaluating an explanation of racial neutrality, the court must keep in mind that proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *See Hernandez*, 500 U.S. at 355–62. It also should keep in mind that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility. *Rice v. Collins*, 546 U.S. 333, 340–42 (2006).

The findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review, *see Elem*, 514 U.S. at 769, as are the findings of the state appellate court, *see Mitleider*, 391 F.3d at 1050; *Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th Cir. 2004). Under AEDPA, this means that a state court's findings of discriminatory intent are presumed sound unless a Petitioner rebuts the presumption by clear and convincing evidence. *Miller-El*, 545 U.S. at 240. A federal habeas court may grant habeas relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice*, 546 U.S. at 338–41.

Applying these legal principles to the instant matter, the Court concludes that Petitioner has not rebutted the presumption that the state court's conclusion was a reasonable one, as demonstrated by an analysis under the relevant case law. The Court need not dwell on the first step of the *Batson* analysis, whether Petitioner made a prima facie case, because (a) the prosecutor offered racially-neutral explanations for striking Jurors B., S., and F., and (b) the trial court ruled on the ultimate question of intentional discrimination. With respect to the second *Batson* step, the Court finds nothing in the record that would support a finding that the prosecutor's decision was based on constitutionally offensive considerations. As the state appellate court found, the prosecutor's stated reasons for the peremptory challenges were supported by the record. As for Juror B., the record supports the prosecutor's stated reasons that Juror B. had a nontraditional lifestyle based on her hair color, and on her not having married even though she had two children by two different fathers at a young age. As for Juror S., the record supports the prosecutor's stated reasons that Juror S. had been criminally prosecuted and had expressed reservations about applying aider and abettor

liability, a theory of criminal liability central to the trial. As to Juror F., the record supports the prosecutor's stated reason that Juror F., a senior legal document specialist at a law firm, had sufficient legal experience to be excluded pursuant to the prosecutor's policy of excluding lawyers and semi-lawyers. As to the third *Batson* step which queries whether there was intentional discrimination, Petitioner has not shown clear and convincing evidence to rebut the presumption that the trial court's determination was correct, or shown why this Court should favor Petitioner's interpretation of the record over the trial court's credibility determination.

      A comparative juror analysis, which was conducted by the state appellate court in its review of Petitioner's claims, further supports this conclusion. The record supports the state appellate court's conclusions that the jurors who may at first glance have appeared similarly situated to Jurors B., S., and F. were in truth not similarly situated, and Petitioner has not offered any persuasive evidence to the contrary. As noted above, Juror B. was differently situated than the alternate juror in that there is a difference between being unmarried and the mother of two children by two different fathers at a young age, and a man who had lost touch with his daughter when she was 17 years old and had had no contact with her for several years. Juror S. was not similarly situated to other jurors who also had expressed reservations about applying aider and abettor liability in that those who had expressed reservations had not, unlike Juror S., been criminally prosecuted, and had milder reservations than Juror S. Juror F. was not similarly situated to other jurors in that she currently worked in the legal profession as a senior legal document specialist at a law firm. Taking all this into account, the Court concludes that Petitioner has not shown that his constitutional rights were violated. Accordingly, Petitioner's claim is DENIED.

## II.    Sentence

      Petitioner claims that his LWOP sentence violates the Eighth Amendment's strictures against cruel and unusual punishment. (Pet. at 17.) Petitioner bases his claim on the facts

that he was young when the crime was committed (he was 21)[3]; he lacked an intent to kill and acted in self-defense; he was raised in a "chaotic" and "abusive" environment by a schizophrenic parent; there were doubts about his competency to stand trial; he had mental illnesses, including depression before incarceration and auditory hallucinations while incarcerated; and he had no prior criminal history. (*Id.* at 18–21.) The state appellate court rejected this claim, finding that the LWOP sentence was not "so disproportionate . . . as to violate the state or federal constitutional proscriptions against cruel or unusual punishment." (Ans., Ex. O at 51.) The appeals court concluded that there was no evidence that: (1) Petitioner was immature for his age; (2) Petitioner shot Miller in self-defense (there was in fact no evidence or claim that Miller was trying to or ever did get his gun out of the holster); or (3) the underlying crime of robbery was "some wholly aberrational event" in his life. (*Id.* at 50.) Petitioner "admitted his involvement in prior armed robberies and was the one who shot and killed Miller." (*Id.* at 51.)

A criminal sentence that is not proportionate to the crime for which the defendant was convicted violates the Eighth Amendment. *Solem v. Helm*, 463 U.S. 277, 303 (1983). Yet "outside the context of capital punishment, successful challenges to the proportionality of particular sentences will be exceedingly rare." *Id.* at 289–90. Eighth Amendment jurisprudence "gives legislatures broad discretion to fashion a sentence that fits within the scope of the proportionality principle — the precise contours of which are unclear." *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003) (internal quotations and citations omitted). Indeed, "[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Ewing*, 538 U.S. at 23 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)). Where it cannot be said as a threshold matter that the crime committed and the sentence imposed are grossly disproportionate, it is not appropriate to engage in a

---

[3] Petitioner asserts that he was 20 at the time (Pet. at 18), while the state appellate court states that he was 21 (Ans., Ex. O at 50).

comparative analysis of the sentence received by the defendant to those received by other defendants for other crimes. *See U.S. v. Harris*, 154 F.3d 1082, 1084 (9th Cir. 1998).

In *Harmelin*, the Supreme Court upheld a life sentence without the possibility of parole for an offender who had no prior felony convictions and whose sole conviction was for possessing 672 grams of cocaine. 501 U.S. at 995, 961. In *Andrade*, the Supreme Court, under the highly deferential AEDPA standard, upheld a sentence of two consecutive 25 year terms for the nonviolent theft of $150 worth of videotapes. 538 U.S. at 77.

Applying these legal precedents, Petitioner's claim cannot succeed. Specifically, Petitioner has not shown that his sentence was grossly disproportionate to his crimes, especially considering that in *Harmelin*, the Supreme Court upheld as constitutional a life sentence for a nonviolent drug possession crime, and in *Andrade*, upheld a 50 year sentence under a recidivist statute for a nonviolent theft crime. If a life sentence for a nonviolent drug possession crime is found not to violate the Eighth Amendment, a state court's affirmation of Petitioner's LWOP sentence for his active and willing participation in an armed robbery that ended, because of Petitioner's direct actions, in murder similarly will not rise to that level.

Furthermore, Petitioner has provided no legal support for his assertion that his sentence was unconstitutional owing to his age, or other possible indications of immaturity. Specific sentences may be challenged as disproportionate for categorical reasons, such as upon the nature of the offense, the nature of the offender, or both. *See Graham v. Florida*, 130 S. Ct. 2011, 2021, 2022 (2010). A challenge to a category of sentences as disproportionate under the Eighth Amendment is informed by objective factors to the maximum possible extent. *Atkins v. Virginia*, 536 U.S. 304, 312 (2002). Instances of clear and reliable objective evidence are legislative consensus and actual sentencing practices, though a court must question "whether there is a reason to disagree with the judgment reached by the citizenry and its legislators." *Id.* at 313. It is also relevant to consider whether the sentence serves the penological justifications of retribution, deterrence,

incapacitation and rehabilitation. *Graham*, 130 S. Ct. at 2028–29. The Supreme Court has found that specific sentences for certain categories of persons do violate the Eighth Amendment. For example, the Supreme Court has found that death sentences for juveniles[4] or the mentally retarded,[5] and LWOP sentences for juveniles for non-homicide convictions,[6] are categorically disproportionate and therefore violate the Eighth Amendment.

Turning to the instant matter, not only does Petitioner not fall under any of these categories, he has not shown that the nature of the offense or his own nature support a finding of categorical disproportionality. Petitioner has not shown, and the Court finds no reason to adopt, a finding that Petitioner's sentence is contrary to legislative consensus or to actual sentencing practices, or that the Court should disagree with the legislative consensus. Punishing Petitioner for being the shooter, the latest crime after a series of robberies he admitted committing, with an LWOP sentence is in accord with legislative consensus, and with actual sentencing practices. Such a serious sentence supports the penological interests in protecting society from Petitioner; serves as a deterrent to others who engage, or plan to engage in, serious crimes; addresses society's need for retribution for Petitioner's commission of the murder; and provides Petitioner with an opportunity for rehabilitation. Furthermore, although Petitioner alleges that his youth should have been considered, Petitioner was an adult at the time of the offense, and he has not shown that he was unusually immature for his age. Also, Petitioner has not shown that his mental illnesses, the doubts about his competency, and the circumstances of his childhood prevented him from forming the necessary criminal intent. Finally, Petitioner's defenses that he lacked the necessary criminal intent to kill and that he acted in self-defense were rejected by the jury, who determined that he indeed possessed the requisite criminal intent. Accordingly, Petitioner's

---

[4] *Roper v. Simmons*, 543 U.S. 551 (2005).

[5] *Atkins v. Virginia*, 536 U.S. 304 (2002).

[6] *Graham*, 130 S. Ct. at 2034.

claim is DENIED.

### III. Alleged Vouching

Petitioner claims that the trial court violated his right to due process by admitting the testimony of Detective Longmire, who vouched for the credibility of another witness, Dwayne Chandler, who had provided the police with crucial information regarding the crime, information given to him by Petitioner. (Pet. at 23; Ans., Ex. O at 6–7.) Chandler recanted his statements at trial, thereby putting his credibility at issue. (Ans., Ex. O at 7.) At trial, Longmire testified that he thought Chandler's information was accurate, *id.*, Ex. F, Vol. 7 at 1417, a judgment about which he felt confident because Chandler's information had been tested by a magistrate at a probable cause hearing, *id.*, Ex. F, Vol. 8 at 1701. Petitioner contends that Longmire's statement was improper vouching because it supports the credibility of a prosecution witness through the opinion of prosecution or government figures. (Pet. at 23.) The state appellate court rejected Petitioner's claim, finding that:

> Longmire's testimony on this point was admissible because it arose after Chandler had recanted his statements to the police and impliedly put the integrity of Longmire's investigation into question . . . In the context of Chandler's testimony, Longmire's statement that he found Chandler's statements to be credible, and corroborated by other information, were admissible to refute the suggestion that Longmire's dealings with Chandler undermined the reliability of the police investigation.

(Ans., Ex. O at 27.)

Petitioner's claim fails. First, Longmire's statement did not constitute vouching. Improper vouching for the credibility of a witness occurs when the prosecutor places the prestige of the government behind the witness or suggests that information not presented to the jury supports the witness's testimony. *United States v. Young*, 470 U.S. 1, 7 n.3, 11-12 (1985); *United States v. Parker*, 241 F.3d 1114, 1119–20 (9th Cir. 2001). Here it was a witness, not the prosecutor, who made the statement. Consequently, there was no vouching. Second, even if Longmire's statement constituted vouching, Petitioner has not shown that the trial court had a duty to act as his advocate when defense counsel failed to raise an objection to Longmire's statement. The trial court had no duty to *sua sponte* stop Longmire's

testimony, announce that Longmire's statement was improper, and strike it. Such an act would likely have caused the jury to pay more attention to Longmire's statement, rather than less. Third, Petitioner has failed to show that he was prejudiced by the statement. Simply put, there was significant evidence other than Chandler's testimony upon which a jury could find Petitioner guilty of the charged offense, including Petitioner's own statements, which were similar to Chandler's, and the videotape evidence. Based on the foregoing, Petitioner's claim is DENIED.

## IV.  Alleged Prosecutorial Misconduct

Petitioner claims that the prosecutor violated Petitioner's right to due process when she committed two instances of prosecutorial misconduct: (a) appealing to the jury's sympathy for the victim; and (b) referring to the possible consequences resulting from a verdict. (Pet. at 25.)

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). A prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F. 3d 926, 929 (9th Cir. 1995) (citation and quotation marked omitted).

### A.  Sympathy for the Victim

Petitioner claims that the prosecutor violated Petitioner's right to due process during closing argument by appealing to the jury's feelings of sympathy toward the victim, James Miller. (Pet. at 25.) For example, the prosecutor said that "James was a single father. He worked hard to provide for his four year old daughter," that "he was a loving brother, a friend, a neighbor," and that though all they had left of Miller were photographs of his

corpse, the jury should remember him as a human being. (Ans., Ex. F, Vol. 10 at 2197–98.) When defense counsel objected to two of these comments, the trial court stated that the jury had been instructed that they were not to consider any appeals to sympathy, passion, or prejudice from the prosecution or the defense. (*Id.* at 2197 & 2209.)

The first factor in determining the prejudicial effects of misconduct is whether the trial court issued a curative instruction. When a curative instruction is issued, a court presumes that the jury has disregarded inadmissible evidence and that no due process violation occurred. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987). This presumption may be overcome if there is an "overwhelming probability" that the jury would be unable to disregard evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the defendant. *Id.*

Under these legal principles, Petitioner's claim fails. First, the trial court issued curative instructions immediately following defense counsel's objections. Second, before and after the presentation of evidence, the trial court instructed the jury that it was to consider the evidence without regard to feelings of sympathy, passion, or prejudice. (Ans., Ex. F, Vol. 3 at 552; Vol. 10 at 2153.) On such facts, it must be presumed that the jury disregarded the prosecutor's comments and that no due process violation occurred. Petitioner's mere allegation is insufficient to establish an "overwhelming probability" that the jury was unable to disregard the evidence or that there was a strong likelihood that the effect of the comments would be devastating to him. Accordingly, Petitioner's claim is DENIED.

### B. Reference to Possible Consequences of Conviction

Petitioner claims that the prosecutor committed misconduct by making certain statements in her closing and rebuttal arguments. (Pet. at 25–26.) The state appellate court summarized the relevant facts as follows:

> The prosecutor urged the jury not to give in to any temptation to give defendants "a break": "Now, as we are all human beings, we have within us a humaneness, and the humaneness is that we can have feelings of sympathy, and we want to give people a break. [¶] [I]t's so very important that you be able to set aside those feelings — not that you don't have them, you wouldn't be

human if you don't have those feelings — but you must be able to set aside those feelings and rely on the facts and the law. [¶] And the law, ladies and gentlemen, is what you, each and every one of you, has promised to follow and to obey. [¶] Now, you would not be following the law if you gave the defendants a break in this case."

The prosecutor returned to this theme in her rebuttal argument: "[Petitioner's lawyer] is asking you to . . . give his client a break. To give him a break. Find him guilty of manslaughter of at the most second-degree murder. At the most. Find him guilty of that. Then, we can all feel good about what we have done: Somebody is held libel [sic]. They all go home." [Petitioner's] lawyer objected, saying " 'They will all go home'" [sic] was a misstatement and an indication of a possible penalty. The court responded, "Let's move on." The prosecutor continued: "Now, ladies and gentlemen, if you do find [Petitioner] guilty of either second-degree murder or manslaughter, make no mistake about it, you are giving him a break."

(Ans., Ex. O at 31.) Petitioner contends that "giving him a break" and "They will all go home" improperly drew the jury's attention to the consequences of their verdict. The state appellate court rejected this claim:

> We do not find it reasonably likely that the jury believed [Petitioner] (or the other defendants) would "go home" if [Petitioner] was not found guilty as charged. In context, the prosecutor intended the word "they" to refer to those jurors who might, wrongly, go home feeling good about what they had done if they brought back a conviction on a lesser charge. She was not referring to defendants. It seems highly unlikely that the jury understood this to mean that defendants would go home if convicted of manslaughter or second degree murder.
>
> There was also nothing improper in the prosecutor's argument that the jury should not give [Petitioner] "a break" by convicting him of a lesser offense. The thrust of her argument was that the evidence supported a conviction for first degree murder, and that if the jury found him guilty of a lesser offense, he would be getting "a break." In context, it was not a reference to the different penal consequences of one verdict or another.

(*Id.* at 31–32.)

Petitioner has not shown that the prosecutor's comments were instances of misconduct or that the state appellate court's determination was an unreasonable interpretation of the facts. "Giving him a break" is not improper. It appears after the prosecutor tells the jury to ignore feelings of sympathy, which is consonant with the court's instructions. Nor is "They all go home" improper; such statement is part of the prosecutor's larger argument that the evidence supports a conviction of the most serious offense. Furthermore, even if these

comments were improper, Petitioner has not shown that he was prejudiced by such comments, as the strong evidence of his guilt attests. Petitioner's claim is DENIED.

## CONCLUSION

The state court's adjudication of the claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petition is DENIED.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

DATED: March 15, 2011

LUCY H. KOH
United States District Judge